******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# RAVON DONALD *v.* COMMISSIONER
# OF CORRECTION
## (AC 44258)

Suarez, Clark and Sheldon, Js.

*Syllabus*

The petitioner, who had been convicted of several crimes in connection with his involvement in an armed robbery and shooting, sought a writ of habeas corpus, claiming, inter alia, that his trial counsel rendered ineffective assistance by failing to adequately investigate his troubled background and upbringing and to present that information as mitigation evidence at the sentencing proceeding. The petitioner, who was nineteen years old at the time of the robbery, was sentenced to seventy-five years of imprisonment. He thereafter filed an application for sentence review with the Sentence Review Division of the Superior Court. Before the start of the habeas trial, the sentence review division granted the petitioner's application for a sentence reduction and concluded that the seventy-five year sentence for nonhomicidal offenses was disproportionate and should be reduced to a term of forty-five years. The petitioner thereafter amended his habeas petition to allege that, had the mitigation evidence been presented to the sentence review division, a reasonable probability existed that he would have received a greater sentence reduction than the thirty years that was ordered. The petitioner testified at the habeas trial that he had been sexually abused as a child, had begun using illegal drugs at age eleven and was consuming drugs and alcohol regularly by age twelve. He testified that he had had little to no relationship with his father, who was a drug user, and had been constantly exposed to violence throughout his youth, during which he became a member of a street gang and witnessed a friend being shot in the head. The petitioner further stated that he had been diagnosed with behavioral and mental health problems during his childhood and had experienced periods of homelessness when he was not institutionalized in group homes and mental health facilities for lengthy periods of time. D, a social worker, who had reviewed the petitioner's records from those facilities, confirmed substantial portions of his social history and testified about the probable adverse effects of his childhood and upbringing on his behavior as a young man. The habeas court analyzed the petitioner's claim under the test set forth in *Strickland* v. *Washington* (466 U.S. 668) for determining whether a petitioner received ineffective assistance and rendered judgment denying the habeas petition. The court concluded that, although the performance of the petitioner's trial counsel at the sentencing proceeding was so paltry as to be tantamount to having had no counsel at all, the petitioner failed to prove that he was prejudiced by that deficient performance before the sentence review division because he did not present evidence to show that the sentence review division would have rendered a decision more favorable to him than the thirty year reduction it ordered. The habeas court further concluded that it could not review or alter the sentence review division's determination because that body's decisions are final under the Sentence Review Act (§ 51-194 et seq.). The court thereafter granted the petitioner certification to appeal. *Held*:

1. The petitioner could not prevail on his claim that the state violated his due process right to a fair trial by presenting false or misleading testimony about its agreement with one of his alleged accomplices, H, to testify against him and by failing to disclose material evidence concerning the credibility of a police detective who led the investigation of the armed robbery and shooting:

   a. The record did not support the petitioner's claim that the state promised H that his sentence would be reduced in exchange for his testimony, as the habeas court found that H never indicated that he had been promised any specific term of incarceration or number of years as a sentence reduction, which was disclosed through his testimony.

   b. Although the state failed to disclose the detective's personnel records, which indicated that he had a disciplinary record, there was no reason-

able probability that the outcome of the petitioner's trial would have been different had those records been disclosed; in the present case, impeachment of the detective through the use of his disciplinary record would not have overcome the overwhelming evidence that supported the petitioner's conviction, which included H's testimony and a video recording that showed the petitioner committing the crime.

2. Although the habeas court correctly required the petitioner to prove under *Strickland* that he was prejudiced by his trial counsel's deficient performance, the judgment had to be reversed and the case remanded for a new trial in light of the court's erroneous determination that it was barred from reviewing or granting relief from the sentence review division's modification of the petitioner's sentence:

a. This court rejected the assertion by the respondent Commissioner of Correction that the habeas court's judgment could be affirmed on the alternative ground that the petitioner failed to prove that his trial counsel rendered deficient performance at the sentencing proceeding: the respondent never presented to the habeas court his claim that, in the absence of expert testimony to establish that competent counsel would have presented the petitioner's mitigation evidence at the sentencing proceeding, the court improperly found that trial counsel's failure to present that evidence constituted deficient performance; moreover, the court's ruling was sufficiently supported by its findings that the petitioner's trial counsel presented almost no argument on his behalf at sentencing, relied almost exclusively on an incomplete presentence investigation report, and failed to investigate and present to the sentencing court any of the substantial mitigation information the petitioner had presented to the habeas court about his troubled background.

b. The habeas court did not err in determining that the petitioner was required to prove under *Strickland* that he was prejudiced by his trial counsel's deficient performance, as the court correctly concluded that the petitioner was not entitled to a presumption of prejudice pursuant to *United States* v. *Cronic* (466 U.S. 648) and *Davis* v. *Commissioner of Correction* (319 Conn. 548): the performance of the petitioner's trial counsel did not constitute or result in a complete denial of representation necessary to invoke the *Cronic* presumption, as counsel alluded to portions of the presentence investigation report that mentioned mitigating facts about the petitioner's background, counsel argued that the petitioner had a conscience, which raised hope for his redemption, based on the petitioner's sometimes unsolicited cooperation with the police about criminal activity, and counsel attempted to help the petitioner preserve his claim of innocence by advising him not to offer his version of the events at issue during his interview for the presentence investigation report.

c. The habeas court erred in ruling that it was barred from reviewing or granting relief as to the deficient performance by the petitioner's trial counsel because of the statutorily mandated finality of the sentence review division's decision to modify the petitioner's sentence; in the present case, the habeas court had the authority under *State* v. *Nardini* (187 Conn. 109) to hear and decide the petitioner's constitutional challenge to his modified sentence and to order a proper remedy for the violation of his right to the effective assistance of counsel, if such a violation were proved at the habeas trial, in the form of an order that his sentence be vacated and his case returned to the trial court for resentencing.

d. This court was persuaded that the absence of the extensive information concerning the petitioner's troubled background and upbringing from the trial court record sufficiently undermined confidence in the sentence review division's determination that the thirty year reduction in the petitioner's sentence was sufficient to remedy the disproportionality of the original seventy-five year sentence: because trial counsel's deficient performance prevented the petitioner from presenting the mitigation evidence to the sentence review division, which is limited to reviewing challenged sentences for disproportionality solely on the basis of the record before the trial court, there was a reasonable probability that the sentence review division's order would have been more favorable to him if counsel's deficient performance had not deprived it of such mitigating information; accordingly, the habeas court's judgment denying the petitioner's claim of ineffective assistance of counsel at sentencing had to be reversed and the case remanded to the trial court for a new sentencing hearing.

Argued March 2—officially released October 18, 2022

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; thereafter, the petitioner filed an amended petition; judgment denying the petition; subsequently, the court denied the petitioner's motion for reconsideration, and the petitioner, on the granting of certification, appealed to this court. *Reversed in part*; *judgment directed*; *further proceedings*.

*Vishal K. Garg*, assigned counsel, for the appellant (petitioner).

*Kathryn W. Bare*, senior assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Angela R. Macchiarulo* and *Michael Proto*, senior assistant state's attorneys, for the appellee (respondent).

*Opinion*

SHELDON, J. Following the granting of his petition for certification to appeal, the petitioner, Ravon Donald, appeals from the judgment of the habeas court denying his fourth amended petition for a writ of habeas corpus, in which he challenged the constitutionality of his conviction of and modified total effective sentence for five felony offenses of which a jury had found him guilty in connection with an armed robbery and the shooting of two clerks at a grocery store in Hartford on December 22, 2011. On appeal, the petitioner contends that the habeas court improperly rejected his claims that (1) the state violated his due process right to a fair trial in the underlying criminal trial by (a) knowingly presenting false or misleading testimony to the jury concerning the details of its agreement with one of his alleged accomplices, Tierais Harris, to testify against him in that trial and (b) failing to disclose material evidence to him, for his use in that trial, concerning the credibility of two of the state's witnesses, both his alleged accomplice, Harris, and the lead detective in the case, Reginald Early, who testified to the petitioner's alleged confession to participating in the armed robbery and shootings on which the charged offenses were based; and (2) his trial counsel in the underlying criminal trial, J. Patten Brown III, rendered ineffective assistance in connection with the petitioner's sentencing after that trial by failing to present an effective argument urging leniency on the petitioner's behalf and failing to support such an argument by developing and presenting to the trial court any of the extensive mitigating information about the petitioner's troubled background and upbringing to which he and his expert witness, Jodi DeSauteles, a social worker employed by the public defender's office, later testified at the habeas trial. Although we conclude that the petitioner failed to establish either of his due process claims, we agree with the petitioner that his trial counsel rendered ineffective assistance in connection with his sentencing and that he was prejudiced by such ineffective assistance with respect to his current total effective sentence, which was later imposed on him by order of the Sentence Review Division of the Superior Court (review division) after it determined that his original total effective sentence was disproportionate and should be reduced by thirty years of imprisonment to remedy its disproportionality. Accordingly, we affirm the habeas court's judgment insofar as it rejects the petitioner's due process claims but reverse that judgment insofar as it rejects his claim of ineffective assistance of counsel at sentencing and remand the case to the habeas court with direction to vacate his modified total effective sentence in the underlying criminal case and to remand the case to the trial court for resentencing.

The following facts and procedural history are rele-

vant to our resolution of this appeal. The petitioner's first jury trial commenced on April 7, 2014, but ended with a mistrial when the jury was unable to reach a unanimous verdict. Following the mistrial, on or about June 10, 2014, the state offered the petitioner a plea bargain under which he would be sentenced to a term of eighteen years of imprisonment followed by seven years of special parole if he would agree to plead guilty to his pending charges. The petitioner declined to accept the state's offer. On February 5, 2015, following a second jury trial on the same charges, a jury found the petitioner guilty as charged of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), assault in the first degree in violation of General Statutes § 53a-59 (a) (1), assault in the first degree in violation of § 53a-59 (a) (5), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a).[1] As a result of that verdict, the petitioner was exposed to a maximum possible sentence on all charges of eighty-five years of imprisonment.

On April 2, 2015, the court sentenced the petitioner to a total effective sentence of seventy-five years of imprisonment, fifteen years of which were mandatory, followed by ten years of special parole. On April 9, 2015, after the petitioner was sentenced, he filed a timely application for sentence review with the review division. Thereafter, on August 18, 2015, while his sentence review application was pending, he timely appealed to this court from his underlying judgment of conviction, and the appeal was transferred to our Supreme Court.

On May 2, 2017, our Supreme Court affirmed the petitioner's conviction in the underlying criminal case by issuing its decision in his direct appeal. *State* v. *Donald*, 325 Conn. 346, 157 A.3d 1134 (2017). In that decision, our Supreme Court, in language later adopted by the habeas court in its memorandum of decision, set forth the facts established in the petitioner's underlying criminal trial concerning the criminal conduct at issue and the subsequent police investigation that led to the petitioner's arrest and conviction in connection therewith: "On the evening of December 22, 2011, the victims, Nicholas Ulerio and Brunilda Villa-Rodriguez, were working behind the counter at Ulerio Grocery Store (grocery store) on Homestead Avenue in Hartford. The [petitioner] and . . . Harris, both wearing masks, entered the grocery store. The [petitioner] was armed with an antique revolver and Harris was armed with a BB gun. The [petitioner] approached the counter and shot the victims multiple times, inflicting serious injuries upon both victims. He then kicked a door repeatedly to gain access to the area behind the counter and proceeded to take approximately $100 from the cash register. The [petitioner] and Harris then left the grocery store. The robbery was recorded on the store's surveil-

lance cameras. . . .

"Detective . . . Early of the Hartford Police Department was the lead detective assigned to investigate the robbery at the grocery store. Early had known the [petitioner] for three years, which resulted in a rapport between them. The [petitioner] felt comfortable enough speaking with Early that in the days prior to the robbery he had attempted to contact Early for help because he was homeless. On the basis of a voice mail message that the [petitioner] had left for Early on December 19, 2011, in which the [petitioner] had sought to turn in an antique revolver to the police for cash, Early believed that the [petitioner] may have participated in the robbery.

"On January 6, 2012, Early contacted the [petitioner] and arranged to meet him in Keney Park, telling the [petitioner] that the purpose of the meeting was to resolve an outstanding warrant. Early and a second detective, Kevin Salkeld, waited for the [petitioner] in an unmarked police vehicle. The [petitioner] arrived at Keney Park at approximately 3:30 p.m., driving a pickup truck. The [petitioner] then voluntarily sat in the front passenger seat of the police vehicle, with Early seated in the driver's seat and Salkeld seated in the backseat. Early spoke with the [petitioner] and the [petitioner] agreed to accompany the detectives to the police station to turn himself in on the outstanding warrant. At that point the [petitioner] understood that he was under arrest. The [petitioner] then informed the detectives that the pickup truck he had driven to Keney Park was stolen and contained drugs. The detectives arranged for other officers to come and tow the vehicle. While waiting for the officers to arrive, Early asked the [petitioner] if he knew anything about the robbery on Homestead Avenue and if he was willing to speak to the police about the robbery. The [petitioner] responded, "'[y]eah, I know about that . . . .'" Salkeld interpreted the [petitioner's] response to mean that the [petitioner] admitted that he had been involved in the robbery. The detectives did not ask the [petitioner] any additional questions about the robbery while at Keney Park.

"The detectives then transported the [petitioner] to the police station, completed the processing of his arrest on the outstanding warrant, and placed him in an interrogation room, where they had him wait while they prepared to question him. The detectives provided *Miranda*[2] warnings to the [petitioner] and at 5:18 p.m., the [petitioner] signed a waiver indicating that he understood his rights and did not wish to invoke them. Subsequently, the detectives questioned the [petitioner] for several hours during which time he provided a detailed statement in which he admitted to participating in the robbery and shooting the victims. Early transcribed the [petitioner's] oral statement into a written statement that the [petitioner] could read and sign. The [peti-

tioner] provided a description of the gun that he used in the robbery, which was the same gun he had previously contacted Early to discuss turning in to the police for cash. He identified the person to whom he sold the gun after the robbery and selected him from a photographic array. The [petitioner] also identified Harris as the other individual involved in the robbery and selected him from a photographic array. Although the [petitioner] initially expressed a desire not to sign the statement, as documented in the statement itself, at approximately 9:30 p.m. the [petitioner] signed it. . . . Subsequent to providing the signed statement, the [petitioner] was arrested and charged . . . .'' (Footnote omitted.) Id., 349–51.

On April 27, 2016, while the petitioner's direct appeal and sentence review application were still pending, the petitioner filed his initial petition for a writ of habeas corpus in this action. Thereafter, on March 6, 2018, the petitioner filed a third amended habeas petition, in which he pleaded four claims of error with respect to his conviction of the charges and original total effective sentence in the underlying criminal case, namely, that (1) his trial counsel's representation of him, both at trial and at sentencing, violated his right to the effective assistance of counsel, (2) the state's knowing presentation of false or misleading testimony at the trial violated his due process right to a fair trial, (3) the state's failure to disclose material evidence favorable to him, at or before the trial, also violated his due process right to a fair trial, and (4) his original total effective sentence of seventy-five years of imprisonment plus ten years of special parole violated his right to be free from cruel and unusual punishment.

On March 12, 2018, the respondent, the Commissioner of Correction, filed a return to the third amended habeas petition pursuant to Practice Book § 23-30,[3] in which he denied or left the petitioner to his proof as to the allegations of the petition and pleaded as a special defense to the petitioner's due process claims that the petitioner had procedurally defaulted on those claims by failing to raise them at trial or on direct appeal, and that he had done so without good cause for or prejudice sufficient to excuse such procedural defaults. On April 10, 2018, pursuant to Practice Book § 23-31,[4] the petitioner filed a reply to the respondent's return, in which he denied that he had procedurally defaulted on his due process claims and pleaded that he could show good cause for and prejudice sufficient to excuse any procedural default that might otherwise be claimed to have arisen from his failure to raise either of those claims at trial or on direct appeal.

Before the start of the habeas trial, on August 16, 2018, a three judge panel of the Superior Court, sitting by designation as the review division, issued its memorandum of decision on the petitioner's application for

sentence review, in which it concluded that the petitioner's original total effective sentence was disproportionate, and that that sentence should be reduced by thirty years of imprisonment, to a term of forty-five years of imprisonment, followed by fifteen years of special parole, to remedy its disproportionality.[5] At the hearing before the review division, the petitioner's new counsel[6] had argued that the petitioner's seventy-five year sentence of imprisonment for the nonhomicidal offenses of which he had been convicted in the underlying criminal case was disproportionate to those offenses because it exceeded the maximum sentence for murder. The state had argued in opposition to the petitioner's application that the petitioner's total effective sentence was not disproportionate because the petitioner's conduct in committing those offenses had involved unnecessary and extreme violence that seriously injured two people. In the words of the assistant state's attorney who argued on behalf of the state, the underlying armed robbery and shootings of the two store clerks, as shown on the grocery store's video recording of the incident, was "the most serious case of this nature that he had ever seen."

In its memorandum of decision, the review division agreed with the sentencing court that "the video of the robbery is shocking. The actions of the [petitioner] require the imposition of a sentence of substantial incarceration." It noted, however, that it had to "examine the entire record before determining if the [sentence] imposed is appropriate and proportional." After conducting that examination, the review division made the following observations: "The record reveals that there were two codefendants in this case. One defendant participated in the robbery by entering the store prior to the robbery and advising his companions that no customers were present. That defendant was prosecuted and sentenced to twelve years, suspended after thirty-four months. The second defendant, who entered the store armed with a BB gun was also prosecuted and he received a sentence of fourteen years of imprisonment, followed by six years of special parole. It must also be noted that, at the time of the robbery, the petitioner was nineteen years old. Although the petitioner was an adult at the time of his offense, his relative youth and immaturity are factors that should be considered in determining an appropriate sentence. In addition, a record of criminal convictions is always a significant factor in sentencing. The petitioner's prior criminal history consisted of a single conviction for a misdemeanor, for which he had received a sentence of an unconditional discharge. In addition, the petitioner had pending charges for larceny and drug offenses." The review division concluded its review of the petitioner's sentence as follows: "After a careful review of the record and an analysis of the offense and the background and age of the petitioner . . . the sentence imposed in this case was disproportionate." The review division therefore

ordered that the petitioner's underlying case be returned to the Superior Court for the judicial district of Hartford with direction that he be resentenced on all charges to a total effective sentence of forty-five years of imprisonment, followed by fifteen years of special parole. On October 3, 2018, the modified total effective sentence was imposed on the petitioner pursuant to the review division's order.

Four days before the start of the habeas trial, on February 7, 2019, the respondent filed a motion to dismiss count four of the third amended habeas petition for lack of subject matter jurisdiction on the ground of mootness based on the review division's intervening order that the petitioner's original sentence of imprisonment be reduced by thirty years. The habeas court did not rule on that motion before the start of the habeas trial.

The evidentiary portion of the habeas trial took place on two nonconsecutive days: February 11 and June 17, 2019. On February 13, 2019, after the first day of trial, the court ordered the parties to file interim trial briefs on or before March 29, 2019, to address, inter alia, the following issues: (1) whether count four of the third amended habeas petition was moot in light of the review division's order that the petitioner's original sentence be reduced; and (2) whether the habeas court was barred from considering the constitutionality of the petitioner's modified sentence imposed by order of the review division.[7]

On March 28, 2019, the petitioner filed his interim trial brief to address the issues raised in the court's February 13, 2019 order. He argued in his brief that count four of the third amended habeas petition was not moot because he was "not claiming that the [review] division made an incorrect decision, based on the record before it. Rather, the petitioner is arguing that his sentence remains disproportionate, even after the modification, in light of his age, criminal history, personal background, and other mitigating information. That mitigating information was never before the [review] division nor the original sentencing court, due to the ineffective assistance of [his] trial counsel. A habeas proceeding is the appropriate mechanism to review such a miscarriage of justice, based upon trial counsel's deficient performance." (Emphasis omitted.) The petitioner's brief further noted that it had been an oversight on the part of his habeas counsel not to seek leave to file a further amendment to his habeas petition to reflect the review division's intervening order that his original total effective sentence be reduced. Accordingly, on the same day that the petitioner filed his interim trial brief, he filed a motion requesting leave to file a fourth amended petition for a writ of habeas corpus, which the habeas court granted the following day. The fourth amended habeas petition, which became

operative on the day it was filed, changed the allegations of the third amended habeas petition to reflect the intervening reduction of the petitioner's original total effective sentence by order of the review division.

The respondent also filed his interim trial brief on March 28, 2019. He first argued in that brief that, because the petitioner's seventy-five year sentence no longer existed, count four of the petitioner's third amended habeas petition had become moot. He also argued that, even if the petitioner could challenge the constitutionality of his modified sentence on the ground of ineffective assistance of counsel in connection with his original sentencing, he could not prevail on that claim because his trial counsel's allegedly deficient performance at sentencing had not in fact caused him prejudice, assertedly because his modified sentence is "commensurate with the nature of the crime and other relevant sentencing factors."

After the parties filed their interim trial briefs, the evidentiary portion of the habeas trial continued on June 17, 2019. On that day, the petitioner presented his own lengthy testimony, which the habeas court would later credit, describing his troubled background and upbringing since childhood, including that he had little to no relationship with his drug abusing father; he had endured repeated sexual abuse by older children as a small child; he had been introduced to and been brought up as a member of a notorious criminal street gang, the Bloods, by his sister's boyfriend, who was then his only male role model; he had constantly been exposed to violence throughout his youth; he started using illegal drugs at the age of eleven and, by the age of twelve, was consuming drugs and alcohol regularly; he had frequently been institutionalized for extended periods of time in group homes and mental health facilities; he had been diagnosed with several behavioral and mental health problems during his childhood but had received only sporadic and inconsistent treatment for those problems; and he had experienced poor living conditions, including periods of homelessness, whenever he was not institutionalized. The petitioner also presented testimony from DeSauteles,[8] a social worker employed by the public defender's office, who had interviewed him extensively about his background and upbringing before the habeas trial. DeSauteles, whose testimony the habeas court also credited, confirmed substantial portions of the petitioner's social history, to which he had testified at the habeas trial, based on her review of official records she had obtained from several of the group homes, institutions and treatment facilities in which the petitioner had been housed, supervised or hospitalized as a child. That information had been requested by the probation officer who prepared the presentence investigation report (PSI) but was never received by her from the keepers of those records before the PSI was drafted and submitted. DeSauteles

also offered a detailed analysis of the probable adverse effects of such a difficult childhood and upbringing on the petitioner's behavior as a young man, based on several well-known risk factors that affect the behavior of persons with similar backgrounds and social histories, as identified by the Centers for Disease Control and Prevention (CDC). She testified that these factors "help to explain why a client would react in a certain way to a certain situation."

On June 3, 2020, the habeas court issued its memorandum of decision denying the petitioner's fourth amended habeas petition. As to the petitioner's due process claims, the habeas court concluded that, although the petitioner had not procedurally defaulted on those claims, he had not established his entitlement to prevail on either such claim. It therefore rejected both of those claims on the merits.

As to the petitioner's claim in count one of ineffective assistance of counsel in connection with his original sentencing, the court first concluded that trial counsel had rendered a constitutionally deficient performance in connection with the petitioner's sentencing because his advocacy efforts on behalf of the petitioner were so "paltry" as to be "tantamount to having no counsel at all." In support of this conclusion, the court noted that counsel had spoken only briefly on the petitioner's behalf at the sentencing hearing, he had limited his remarks to a few brief references to the petitioner's PSI, and he had presented no other information or materials in support of a plea for leniency. The record before the sentencing court thus lacked any of the extensive mitigating information about the petitioner's troubled background and upbringing, or its probable effects on the petitioner's behavior as a young man, that the petitioner and his expert witness had described in their testimony at the habeas trial and the habeas court had found to be significant, credible, and compelling.

Turning next to the question of whether trial counsel's deficient performance at sentencing had caused the petitioner to suffer actual prejudice, the habeas court first stated that "[t]he petitioner did not present any evidence from which the court [could] conclude that the sentencing court would have imposed a different total effective sentence" on the petitioner if his counsel had not performed deficiently at sentencing. Thereafter, however, the court went on to note that, despite the lack of evidence that the sentencing court would have imposed a different sentence on the petitioner if it had known of the extensive mitigating evidence that trial counsel had failed to present to it, the review division had ruled that the petitioner's original total effective sentence was disproportionate and that it should be reduced by thirty years of imprisonment to remedy its disproportionality. In light of that ruling, to which all three of the review division's judges had

agreed after they had carefully reviewed the record and analyzed "the nature of the offense and the background and age of the petitioner," the habeas court concluded that, if trial counsel had not performed deficiently at the petitioner's sentencing, the imposition of a lesser sentence on him would have been "objectively probable."

Notwithstanding this conclusion, because the petitioner's claim of prejudice arising from trial counsel's deficient performance at his original sentencing was now directed, under his fourth amended habeas petition, to the modified total effective sentence that was later imposed on him by order of the review division, the court went on to consider whether counsel's deficient performance at sentencing had caused the petitioner prejudice before the review division as well. It answered this question in the negative, explaining that it could not make such a finding "for two reasons: first, the petitioner ha[d] not presented any evidence to show that the sentence review division's decision would have been even more favorable to him than the thirty year reduction [it previously ordered] and second, to so hold would require this court to vacate the sentence review division's decision on substantive grounds, which involves exercise of authority this court does not possess." As to the first of these reasons, the court offered no explanation as to why, if trial counsel had rendered a competent performance at the petitioner's original sentencing by presenting the extensive mitigating information about petitioner's troubled background and upbringing to the trial court, and thus causing such information to be included in the record that came before the review division, such previously unpresented evidence would not potentially have warranted a more substantial reduction of his original sentence than the thirty year reduction that the review division initially ordered. As to the second of these reasons, the court ruled, more particularly, that a habeas court cannot review or alter any sentence after it has been modified by order of the review division because the discretionary decisions of the review division under the Sentence Review Act, General Statutes § 51-194 et seq.,[9] as to whether and how a sentence should be modified to remedy its alleged disproportionality are final, and thus are not reviewable or alterable on direct appeal or in other postconviction proceedings such as habeas corpus actions.

On July 22, 2020, after the habeas court denied the petitioner's postsentencing motion for reconsideration,[10] in which he claimed for the first time that the habeas court should have presumed, under *United States* v. *Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), that he was prejudiced by his trial counsel's deficient performance at sentencing rather than requiring him to prove that he had been prejudiced by that deficient performance, as otherwise required to

establish ineffective assistance of counsel under the test set forth in *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the petitioner filed a petition for certification to appeal from the habeas court's final judgment, which the court granted on July 28, 2020. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The petitioner first claims that the state violated his due process right to a fair trial at his underlying criminal trial by (1) knowingly presenting false or misleading testimony to the jury concerning the details of its agreement with one of his alleged accomplices, Harris, to testify against him in that trial and (2) failing to disclose material evidence to him, for his use in that trial, concerning the credibility of two of the state's witnesses, both Harris and the lead detective in the case, Early, who testified to the petitioner's alleged confession to having participated in the armed robbery and shootings on which the charged offenses were based. We address each claim in turn.

A

The petitioner argues that the habeas court erred in concluding that he failed to prove his claim that the state presented false testimony from Harris. Specifically, the petitioner asserts that Harris testified falsely at his criminal trial regarding Harris' alleged agreement with the state for a sentence modification in exchange for testimony against the petitioner on behalf of the state. The petitioner contends that "Harris' testimony misled the jury because he withheld the fact that the [state] had promised to support a modification . . . and that he anticipated that his sentence would be reduced substantially . . . ." He further contends that, "even if this court finds that the [state] made no promises, Harris' testimony was nonetheless misleading because it suggested to the jury that the [state's] only role in the sentence modification process was an agreement for a hearing." The respondent argues that there is no evidence that Harris testified falsely or in a misleading manner about his agreement with the state and that, even if Harris did testify falsely, there is no reasonable likelihood that the misleading testimony could have affected the judgment. We agree with the respondent that the evidence does not support the petitioner's claim.

The following additional facts are relevant to our resolution of this claim. At the petitioner's criminal trial, the state presented testimony from Harris. The following colloquy occurred during Harris' direct examination by the prosecutor:

"Q. Now, so it's clear, you expect to get permission from the state, which is myself, to get back in front of [the] sentencing judge, okay, and you're looking for a

modification downward on your sentence, right? You understand that?

"A. Yes.

"Q. And that is your truthful testimony today?

"A. Yes.

"Q. Okay. And you also hope that the state, which would be me, would speak positive about how you assisted in this matter?

"A. Yes."

During cross-examination, the following colloquy occurred between trial counsel and Harris:

"Q. . . . [Y]ou were told that you could go back to the judge and get less time, correct?

"A. I wasn't guaranteed any—I wasn't guaranteed anything.

* * *

"Q. Okay. And the only other way [your sentence] could change is if you testify here today and you're allowed to go before the judge, and then the judge that originally sentenced you can lower your time, correct?

"A. I don't know what you mean by that. Like it was promised that it was going to happen?

"Q. No, I just asked you that's the only way it could happen, correct?

"A. Yeah, that's the only way it could happen.

"Q. And you want the prosecutor, this gentleman here, to go tell the judge good things about you, that you cooperated, correct?

"A. Hopefully, yes.

"Q. And you would—you would agree with me that it's not in your best interest for him to go tell the judge that you did not testify truthfully over there, correct?

"A. It honestly really don't matter.

"Q. It doesn't matter?

"A. No.

"Q. Why doesn't it matter?

"A. Because if he talked to her or not it's only her decision to do what she feel in the case.

"Q. Yeah, but you want him to say good things about you, don't you?

"A. I want—I want everybody to say good things about me.

"Q. Okay. And you want to help yourself, right?

"A. Who wouldn't?"

During redirect examination, the following colloquy

occurred between the prosecutor and Harris:

"Q. Now, and you answered this. The ultimate decision of whether you receive a modification downwards on your sentence, the ultimate decision is the judge, isn't it?

"A. Yes.

"Q. So, you're actually taking a risk by testifying today?

"A. Yes.

"Q. Because you don't know what the end result will be?

"A. Yes."

Thomas LaPointe, a private investigator hired by the petitioner in preparation for the habeas trial, also testified at the habeas trial. LaPointe testified that he interviewed Harris in August, 2017, and that Harris told him that a modification in his sentence would be "up to the judge, but he could get [ten], [five], or maybe even go home." LaPointe further testified that he recalled "there was a promise in [Harris'] mind" and that Harris told him that he would not have testified if there was not a deal in place. However, LaPointe also testified that he did not "remember [Harris] saying anything about a promise. I remember him saying there was a conversation between a habeas attorney and a prosecutor, but I don't know—I'm not sure if he said the word, promise."

In its memorandum of decision, the habeas court found that "Harris never indicated that the [state] had promised any specific term of incarceration or number of years the sentence reduction would confer." In analyzing the petitioner's due process claim, the habeas court concluded that "the claim . . . must fail because the petitioner has failed to show that Harris presented false or misleading testimony that the state failed to correct."

We are guided by the following legal principles in resolving this claim. "Whether a prosecutor knowingly presented false or misleading testimony presents a mixed question of law and fact, with the habeas court's factual findings subject to review for clear error and the legal conclusions that the court drew from those facts subject to de novo review." *Greene* v. *Commissioner of Correction*, 330 Conn. 1, 14, 190 A.3d 851 (2018), cert. denied sub nom. *Greene* v. *Semple*, U.S.    , 139 S. Ct. 1219, 203 L. Ed. 2d 238 (2019).

"The rules governing our evaluation of a prosecutor's failure to correct false or misleading testimony are derived from those first set forth by the United States Supreme Court in *Brady* v. *Maryland*, 373 U.S. 83, 86–87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) . . . . In *Brady*, the court held that the suppression by the prosecution of evidence favorable to an accused upon request

violates due process [when] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [prosecutor]. . . . [T]he *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 369–70, 71 A.3d 512 (2013).

"[D]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception." (Citation omitted; internal quotation marks omitted.) *Greene* v. *Commissioner of Correction*, supra, 330 Conn. 15.

The petitioner asserts that the agreement between Harris and the state included a promise by the state that his sentence would be reduced. The record does not support this assertion. In support of this claim, the petitioner principally relies on LaPointe's testimony at the habeas trial. The habeas court, however, made a finding of fact[11] that Harris never indicated that the state had "promised any specific term of incarceration or number of years" for a sentence reduction. "An agreement by a prosecutor with a cooperating witness to bring the witness' cooperation to the attention of the judge who later sentences the witness on his own pending criminal charges is a deal that must be disclosed to the defendant against whom [she] testifies, even if the deal does not involve a specific recommendation by the prosecutor for the imposition of a particular sentence." (Internal quotation marks omitted.) *Turner* v. *Commissioner of Correction*, 181 Conn. App. 743, 759, 187 A.3d 1163 (2018). This is precisely the kind of deal that Harris had with the state, and the record reveals that, contrary to the petitioner's assertion, it *was* fully disclosed through Harris' testimony at the underlying criminal trial.

Accordingly, we conclude that Harris did not testify falsely or in a misleading manner, and, thus, the habeas court properly concluded that the petitioner failed to prove this claim.

B

The petitioner also claims that the court erred in concluding that the state did not fail to disclose material, exculpatory evidence. Specifically, the petitioner contends that the state knew of and failed to disclose internal affairs complaints that had a bearing on the credibility of Early.[12] The petitioner argues that, had this evidence been presented, there is a reasonable

probability that the outcome of his criminal trial would have been different. The respondent argues that no material, exculpatory information existed with respect to Harris' agreement with the state and that the disclosure of the internal affairs records would not have overcome the evidence presented by the state against the petitioner. We agree with the respondent.

The following additional facts, as found by the habeas court, are relevant to our resolution of this claim. "Another component of the defense strategy . . . was impeaching the credibility of . . . Early . . . . According to Early, the petitioner contacted him three days before the . . . incident to ask about selling a long barrel revolver to Early as part of a police buyback program. Early recorded the voice mail the petitioner left for him inquiring about the gun buyback program. The video of the robbery and shooting showed an individual who looked like the petitioner firing a weapon that resembled a long barrel revolver. Viewing the store video of the incident prompted Early to contact the petitioner and arrange a meeting with him. Early met with the petitioner to discuss the robbery and shooting. The petitioner acknowledged to Early that he had information about what happened . . . and was willing to speak further about the incident. After [another detective] joined them, the detectives and the petitioner went to the police station for further questioning that eventually resulted in the petitioner's statement admitting his involvement.

"[The petitioner's trial counsel] made his standard discovery request by way of a motion filed once the case was on the trial list. Prior to a case being on the trial list, [trial counsel's] practice is to essentially make the same request via a letter to the state's attorney. These requests include any information concerning witnesses who have a personal interest in cooperating with the prosecution. The prosecutor gave [the petitioner's trial counsel] access to the state's file and provided him with copies of what the state had. The case proceeded to trial after the discovery between the state and defense, and, after the first trial resulted in a hung jury, the petitioner was convicted after the second trial.

"[The petitioner's trial counsel] indicated that he requested Early's personnel file. Although Early's personnel file was not disclosed as a result of his request, [trial counsel] did not subpoena the personnel file. [Trial counsel] did not know, therefore, that Early had a disciplinary record involving excessive use of force, making false statements, and abuse of power. Consequently, [trial counsel] was unable to use such information to attempt to impeach Early's credibility on cross-examination."

The following principles govern our analysis of this claim. "As set forth by the United States Supreme Court in *Brady* v. *Maryland*, supra, 373 U.S. 87, [t]o establish

a *Brady* violation, the [defendant] must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the [defendant], and (3) it was material [either to guilt or to punishment]. . . . Whether the [defendant] was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *State* v. *Bryan*, 193 Conn. App. 285, 315, 219 A.3d 477, cert. denied, 334 Conn. 906, 220 A.3d 37 (2019).

"Not every failure by the state to disclose favorable evidence rises to the level of a *Brady* violation. Indeed, a prosecutor's failure to disclose favorable evidence will constitute a violation of *Brady* only if the evidence is found to be material. . . . Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial . . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. . . . In evaluating the reasonable probability standard, we should be aware of what adverse effect the nondisclosure may have had on the [petitioner's] preparation or presentation of his case and that we should act with an awareness of the difficulty of reconstructing in a [posttrial] proceeding the course that the defense and the trial would have [otherwise] taken . . . . On the other hand, we must also recognize that the mere possibility that an item of undisclosed evidence might have helped the defense or might have affected the outcome of the trial, [however, does] not establish materiality in the constitutional sense." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 316–17.

On the basis of the record, we conclude that there is no reasonable probability that the outcome of the petitioner's trial would have been different had the state disclosed Early's personnel records. Although the records could have been used to impeach Early's testimony, such impeachment would not have overcome the overwhelming evidence adduced at trial supporting the petitioner's conviction, including a video of the petitioner committing the crime and Harris' testimony against the petitioner. "[T]his was not a case in which the prosecution's case hinge[d] entirely on the testimony of [the witness in question] . . . . Rather . . . there was ample evidence to support the petitioner's conviction. . . . Therefore, we cannot say that the fact that the state did not disclose the evidence [in question] . . . undermines our confidence in the jury's verdict, as there was no reasonable probability that the jury

would have reached a different verdict if it had heard and considered this undisclosed impeachment evidence." (Citations omitted; internal quotation marks omitted.) *Elsey* v. *Commissioner of Correction*, 126 Conn. App. 144, 160, 10 A.3d 578, cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011).

## II

The petitioner's final claim on appeal is that the habeas court erred in denying his claim that his trial counsel had rendered ineffective assistance in connection with his original sentencing in the underlying criminal case. We first set forth the relevant legal principles that govern our analysis of that claim.

"The sixth amendment provides that in all criminal prosecutions, the accused shall enjoy the right to the effective assistance of counsel. . . . This right is incorporated to the states through the due process clause of the fourteenth amendment." (Internal quotation marks omitted.) *Edwards* v. *Commissioner of Correction*, 183 Conn. App. 838, 843, 194 A.3d 329 (2018). "Under the two-pronged *Strickland* test, a [petitioner] can only prevail on an ineffective assistance of counsel claim if he proves that (1) counsel's performance was deficient, and (2) the deficient performance resulted in actual prejudice. . . . To demonstrate deficient performance, a [petitioner] must show that counsel's conduct fell below an objective standard of reasonableness for competent attorneys. . . . To demonstrate actual prejudice, a [petitioner] must show a reasonable probability that the outcome of the proceeding would have been different but for counsel's errors." (Internal quotation marks omitted.) Id.

"To establish prejudice, [i]t is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . A claimant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Hilton* v. *Commissioner of Correction*, 161 Conn. App. 58, 77, 127 A.3d 1011 (2015), cert. denied, 320 Conn. 921, 132 A.3d 1095 (2016). "A reasonable probability is one which is sufficient to undermine confidence in the result." *Ruffin* v. *Commissioner of Correction*, 106 Conn. App. 396, 399, 943 A.2d 1105, cert. denied, 286 Conn. 922, 949 A.2d 481 (2008).

"*Strickland* recognized, however, that [i]n certain [s]ixth [a]mendment contexts, prejudice is presumed. . . . In . . . [*United States* v. *Cronic*, supra, 466 U.S. 648] . . . which was decided on the same day as *Strickland*, the United States Supreme Court elaborated on the following three scenarios in which prejudice may be presumed: (1) when counsel is denied to a [petitioner] at a critical stage of the proceeding; (2) when counsel entirely fails to subject the prosecution's

case to meaningful adversarial testing; and (3) when counsel is called upon to render assistance in a situation in which no competent attorney could do so. . . . This is an irrebuttable presumption." (Citation omitted; internal quotation marks omitted.) *Edwards* v. *Commissioner of Correction*, supra, 183 Conn. App. 843–44.

The second listed scenario in which prejudice arising from trial counsel's deficient performance may be presumed, which the petitioner claims is relevant to what occurred in the present case, has been held to involve "an actual breakdown of the adversarial process, which occurs when counsel completely fails to advocate on a defendant's behalf. . . . Counsel's complete failure to advocate for a defendant . . . such that no explanation could possibly justify such conduct, warrants the application of *Cronic*." (Citations omitted; internal quotation marks omitted.) *Cruz* v. *Commissioner of Correction*, 206 Conn. App. 17, 32, 257 A.3d 399, cert. denied, 340 Conn. 913, 265 A.3d 926 (2021). "The United States Supreme Court has emphasized . . . how seldom circumstances arise that justify a court in presuming prejudice, and concomitantly, in forgoing particularized inquiry into whether a denial of counsel undermined the reliability of a judgment . . . ." (Internal quotation marks omitted.) *Leon* v. *Commissioner of Correction*, 189 Conn. App. 512, 531, 208 A.3d 296, cert. denied, 332 Conn. 909, 209 A.3d 1232 (2019). "[C]ases have emphasized that the second *Cronic* exception is exceedingly narrow. . . . [C]ourts have rarely applied *Cronic*, emphasizing that only non-representation, not poor representation, triggers a presumption of prejudice." (Internal quotation marks omitted.) Id., 533.

"The [s]ixth [a]mendment requires effective assistance of counsel at critical stages of a criminal proceeding. Its protections are not designed simply to protect the trial, even though counsel's absence [in these stages] may derogate from the accused's right to a fair trial. . . . The constitutional guarantee applies to pretrial critical stages that are part of the whole course of a criminal proceeding, a proceeding in which defendants cannot be presumed to make critical decisions without counsel's advice. This is consistent, too, with the rule that defendants have a right to effective assistance of counsel on appeal, even though that cannot in any way be characterized as part of the trial. . . . The precedents also establish that there exists a right to counsel during *sentencing* . . . . [See *Glover* v. *United States*, 531 U.S. 198, 203–204, 121 S. Ct. 696, 148 L. Ed. 2d 604 (2001)]. Even though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because any amount of [additional] jail time has [s]ixth [a]mendment significance. [Id., 203]. . . . *Lafler* v. *Cooper*, 566 U.S. 156, 165, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012); see also *Ebron*

v. *Commissioner of Correction*, [120 Conn. App. 560, 581–82, 992 A.2d 1200 (2010)] (habeas court properly determined that petitioner suffered prejudice when trial counsel's deficient performance resulted in additional incarceration); see id., 582 (The petitioner suffered the prejudice of . . . [additional] incarceration as a direct result of [trial counsel's] deficient performance. . . . Further, the outcome of the proceedings was affected directly by the petitioner's counsel . . . and [resulted in] the loss of a lesser sentence.).'' (Emphasis in original; internal quotation marks omitted.) *Dennis* v. *Commissioner of Correction*, 189 Conn. App. 608, 628–29, 208 A.3d 282 (2019). To prevail on a claim of ineffective assistance of counsel at sentencing, the petitioner must therefore prove, except in the limited circumstances where prejudice may be presumed under *Cronic*, that there is a reasonable probability that he would have received a more favorable sentence than he did receive had it not been for his trial counsel's constitutionally deficient performance in connection with his sentencing.

"The issue of whether the representation that a [petitioner] received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, the question requires plenary review unfettered by the clearly erroneous standard." (Internal quotation marks omitted.) *Edwards* v. *Commissioner of Correction*, supra, 183 Conn. App. 843.

In the present case, the petitioner argues, more particularly, that the habeas court erred in ruling that (1) it had no power to review or alter his challenged sentence on the ground of ineffective assistance of counsel because that sentence had been imposed on him by order of the review division after it had reviewed his original sentence for alleged disproportionality and made its final, unreviewable decision as to how that sentence should be modified to remedy its proven disproportionality, (2) to establish his claim of ineffective assistance of counsel at sentencing, the petitioner had to prove that he was prejudiced by his trial counsel's deficient performance at sentencing under the rule of *Strickland* v. *Washington*, supra, 466 U.S. 668, and that it could not be presumed that he had been prejudiced by that deficient performance under the authority of *United States* v. *Cronic*, supra, 466 U.S. 648, and (3) the evidence presented by the petitioner to prove that he was prejudiced by his trial counsel's deficient performance in connection with his original sentencing was insufficient to meet his burden of proving prejudice under the second prong of the test set forth in *Strickland*. The respondent disputes each of these claims of error and further argues, as an alternative basis for affirming the habeas court's denial of the petitioner's claim of ineffective assistance of counsel at sentencing, that the petitioner failed to meet his threshold burden of proving that his trial counsel's performance at sen-

tencing was constitutionally deficient under the first prong of *Strickland*. The petitioner opposes the respondent's challenge to the habeas court's ruling that his trial counsel rendered a constitutionally deficient performance in connection with his original sentencing.

A

Before addressing the petitioner's several arguments as to why the habeas court erred in denying his claim of ineffective assistance of counsel at sentencing under the second prong of *Strickland*, we will consider the respondent's argument that the habeas court's denial of that claim should be affirmed on the alternative ground that the petitioner failed to prove, as a preliminary matter, that his trial counsel's performance in connection with that sentencing was constitutionally deficient. The following additional facts are relevant to the habeas court's challenged ruling as to trial counsel's deficient performance in connection with the petitioner's sentencing.

On April 2, 2015, at the petitioner's original sentencing hearing in the underlying criminal case, the trial court, *Kwak, J.*, began by addressing a motion from the petitioner's trial counsel to withdraw as counsel of record, which had been filed with the court on the day before sentencing. The motion to withdraw noted that the petitioner had filed a grievance against trial counsel, accusing him of ethical lapses and of violating the attorney-client privilege, and stated that, as a result of such allegations against him, counsel wanted to withdraw from the case because he "would rather not have the appearance [of an actual conflict of interest] hanging as a cloud [over the case] . . . ." At the hearing on his motion to withdraw, trial counsel told the court that, on the day before, the petitioner had informed him that he did not "want me on his case and didn't want to discuss the case with me . . . ." The court denied the motion from the bench,[13] then proceeded directly to sentencing.

In the ensuing sentencing proceeding, trial counsel briefly addressed the court as follows on behalf of the petitioner: "As you know, my client has indicated in communications [that] he wishes to appeal and maintains his innocence, but I'll address a couple matters in the [PSI] I just want to highlight for Your Honor's consideration. . . . [I]t's not discussed extensively—but there's some issues with his upbringing if you read between the lines, where his mother sent him off, and I think to the extent that you could interpret them as not being that way. I think that [he has had a] life of seemingly being kind of [a] drifter . . . . He's just a guy involved in very low-level misconduct and was kind of almost living on the streets at some point. . . . Detective Early also did mention . . . that [the petitioner] had in the past provided information to him, sometimes solicited sometimes unsolicited, about crim-

inal activity and drug dealing in the neighborhood. So, I think that speaks to the fact that there is some conscience there and some hope of redemption in the future. And again, I am reiterating that my client wants to appeal and I'm assuming for the sake of this proceeding that everything is correct in the [PSI]."[14]

Thereafter, having also heard from the state, the victims via a victim impact statement, and the petitioner himself, the trial court made remarks concerning the nature of the crime, the impact of the crime on the victims, and the petitioner's background and its impact on the court's sentencing decision. Concerning the petitioner's background, in particular, the court remarked as follows: "According to the PSI, the [petitioner] was in foster care for a few years because his mother was not able to control him. He has a history of substance abuse, including marijuana, cocaine, ecstasy, and heroin. [The petitioner] has a history of not being able to follow the rules. . . . According to the PSI, he may have had a mild or moderate mental health disorder, which this court has taken into consideration in the sentence. [The petitioner] may not have had the best of childhoods but it certainly was not the worst and it doesn't explain his actions and does not excuse his heinous behavior, but the court will show some leniency due to that fact. But make no mistake, the court considers [the petitioner] a significant danger to society. . . . And I know [the petitioner] apologized to the victims but I'm not sure whether that was a sincere apology. . . . Of all the factors that must be considered, the ones that weigh heavily in the court's mind are the nature and circumstances of the offenses, the harm to the victims, and the need for just punishment." The court then imposed a total effective sentence of seventy-five years of imprisonment, fifteen of which were mandatory, followed by ten years of special parole.

On June 3, 2020, the habeas court issued its memorandum of decision denying the fourth amended habeas petition. In its memorandum of decision, the habeas court found that, at the sentencing hearing, trial counsel did not have any information beyond that which was already included in the PSI. The PSI did not extensively discuss the details of the petitioner's background, to which the petitioner testified at the habeas trial. On this subject, the habeas court stated: "Significant and extensive evidence was presented at the habeas trial by the petitioner and . . . DeSauteles. This evidence is compelling and should have been available to [the petitioner's trial counsel] to present at sentencing. Although the attorney-client relationship had deteriorated between the conclusion of the . . . trial and the sentencing, which prompted the petitioner to unsuccessfully seek the replacement of [his trial counsel, trial] counsel's efforts at sentencing were paltry at best. [Trial counsel] referenced the PSI report and made almost no argument on the petitioner's behalf. [Trial

counsel's] lack of advocacy at sentencing was tantamount to having no counsel at all. The court finds that [trial counsel] was deficient for failing to investigate, compile, and present mitigating evidence at the petitioner's sentencing."

In support of the respondent's claim of evidentiary insufficiency as to the element of deficient performance, he argues that the petitioner presented no evidence at the habeas trial that trial counsel's relatively brief remarks at sentencing and sole reliance on the petitioner's PSI to bring information about his troubled background and upbringing to the attention of the sentencing court fell below an objective standard of reasonableness, as required to establish deficient performance. He objects, in this regard, to the petitioner's alleged failure to establish the prevailing professional norms governing the conduct of defense attorneys at sentencing in 2015, to introduce evidence as to what a reasonably competent defense attorney would have done in that time frame to prepare himself for sentencing, or to present additional mitigating evidence to the trial court that was not included in the PSI. The respondent further argues that the petitioner failed to present evidence as to whether a reasonably competent defense attorney would have procured and presented to the sentencing court the kind of risk assessment analysis to which the petitioner's expert, DeSauteles, testified at the habeas trial. Finally, he contends that the petitioner presented no evidence that trial counsel's representation fell below an objective standard of reasonableness when the petitioner's relationship with counsel had deteriorated to the point that the petitioner had filed a grievance against counsel and refused to talk to him on the eve of sentencing, prompting counsel to move to withdraw from the petitioner's case. The respondent did not argue that he had answers to any of these questions, but only that the petitioner had not supplied those answers himself in the evidence he presented to the habeas court. To prevail on this argument, the respondent bears the burden of establishing that the habeas court erred in ruling that the petitioner's trial counsel rendered a constitutionally deficient performance in connection with his original sentencing.

A major portion of the "[s]ignificant and extensive evidence" that was presented at the habeas trial by the petitioner and DeSauteles, which the habeas court described as "compelling" and found should have been "available to [trial counsel] to present at sentencing," is a classic kind of mitigating information that courts routinely consider in fashioning criminal sentences, which defense attorneys are duty bound to gather and present on behalf of their clients whenever it is reasonably available to them.[15] This is information about the petitioner's personal background and social history, at least some of which was gathered and reported to the trial court by the probation officer who prepared the

PSI in this case. Such information goes directly to the petitioner's prior behavior and responses to past criminal punishments imposed on him, to his proven willingness and ability to follow through with and respond appropriately to educational opportunities and courses of treatment previously made available to him, and to his resulting potential for successful rehabilitation without the need for such serious punishment to deter him from future criminal behavior as might otherwise be the case. It also sheds light on his circumstances at the time he offended in the case before the court, offering insights as to what led him to engage in such conduct and whether, and in what circumstances, he is likely to engage in similar conduct in the future.

In the present case, the initial source of information about the petitioner's background and upbringing was the petitioner himself. He described his difficult childhood in detail to the probation officer who prepared his PSI, listing specifically all of the group homes, hospitals, and treatment facilities where he had been housed and treated since his mother first sent him away at the age of six. Although the social history section of his PSI briefly mentioned several of these homes, institutions and treatment facilities by name, it did not describe in any detail what treatment the petitioner received while at those facilities, or what behaviors he exhibited, problems he experienced, or progress he made while there. That was because the official records of such placements and courses of treatment were never provided to the probation officer who prepared the PSI, despite her request for them, before she submitted the PSI. Indeed, although the PSI was completed on February 27, 2015, more than one full month before the date of sentencing and signed on March 31, 2015, two days before the date of sentencing, no addendum to the PSI was ever prepared to reflect that the requested records had never been provided to the probation officer who prepared the PSI or thus to inform the trial court of their contents. Moreover, although trial counsel received and reportedly read the PSI before sentencing, he never took note of or attempted to remedy the unavailability of such records with the probation officer who prepared the PSI, or thus to the trial court, before the petitioner's sentencing. Had he done so, he would have learned the details of his nineteen year old client's checkered childhood, including thirteen years of institutionalization and treatment, as described by the petitioner himself and confirmed by DeSauteles, who did obtain and examine those records before she testified at the habeas trial. The habeas court credited DeSauteles' testimony concerning the petitioner's supervision and treatment records and their contents, as well as the petitioner's testimony concerning his background, which the records confirmed.

Although the petitioner's relationship with trial counsel had broken down by the time of sentencing, that did

not relieve counsel of his obligation to gather mitigating information from and about the petitioner prior to that time, or to present such information in support of a plea for leniency on the petitioner's behalf at his sentencing hearing. See *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 670, 159 A.3d 1112 (2017) ("a defendant's refusal to assist in discovering certain evidence does not relieve counsel of his or her obligation to investigate and seek such evidence from other sources" (emphasis omitted)). First, counsel could and should have begun the process of compiling mitigating information about the petitioner from the petitioner himself much earlier than the day before sentencing, when the petitioner reportedly refused to speak with him. See *Sease* v. *Commissioner of Correction*, 212 Conn. App. 99, 106–107, 274 A.3d 129 (2022) ("Early in the representation, and throughout the pendency of the case, defense counsel should consider potential issues that might affect sentencing. . . . If a presentence report is made available to defense counsel, counsel should seek to verify the information contained in it, and should supplement or challenge it if necessary." (Citations omitted; internal quotation marks omitted.)) Second, the PSI clearly indicated that the petitioner had cooperated with the probation officer who prepared the PSI at his PSI interview by informing her about his troubled background and the history of his supervision and treatment, the accuracy of which was confirmed by DeSauteles' testimony. This demonstrated that, if trial counsel had spoken with his client earlier about his upbringing and obtained the missing records himself, he could have obtained a great deal of useful mitigating information that was not included in the PSI for later use at the petitioner's sentencing. For example, armed with such information, counsel could have informed the trial court that its impression of the quality of the petitioner's childhood was incorrect, for unlike the bland and understated description of it offered by the trial court in its sentencing remarks, the petitioner's childhood was, in fact, much worse. Accordingly, the habeas court appropriately found that trial counsel's failure to take even minimal steps to prepare for and to deliver an advocate's presentation to the sentencing court based on such disturbing information, instead of relying exclusively on the incomplete PSI for that purpose, marked his efforts at sentencing as "paltry," and constituted a constitutionally deficient performance that was tantamount to having no counsel at all.

In making its finding that trial counsel performed deficiently, the habeas court also credited and relied on DeSauteles' testimony concerning the manner in which the petitioner's behavior as a young adult was probably affected by his troubled childhood and diminished life prospects due to the several types of risk factors that apply to persons with his background, as identified by the CDC. This evidence was introduced

by the petitioner at the habeas trial without objection. The respondent never claimed before the habeas court, as he does on appeal, that that evidence furnished an improper basis for finding that trial counsel's failure to present it to the trial court at sentencing constituted deficient performance in the absence of expert testimony specifically establishing that competent counsel would have developed and presented it in aid of a client's sentencing in 2015. Therefore, because such an argument was never presented to or considered by the habeas court when making its determination that the petitioner had met his burden of proving deficient performance by his trial counsel, it cannot appropriately be relied on by the respondent in this appeal as a basis for affirming the habeas court's judgment on the alternative ground that the petitioner failed to prove deficient performance under the first prong of *Strickland*. See *State* v. *Juan J.*, 344 Conn. 1, 16–17, 276 A.3d 935 (2022) (declining to review unpreserved claim of alternative ground to affirm judgment); *Mangiafico* v. *Farmington*, 331 Conn. 404, 429, 204 A.3d 1138 (2019) (applying to alternative ground for affirmance rule that appellate court will not consider claim, constitutional or otherwise, that has not been raised and decided in trial court).

We conclude that the habeas court's challenged ruling is sufficiently supported by its findings as to deficiencies in counsel's performance—particularly, by counsel's presentation of almost no argument for the petitioner at sentencing, his near exclusive reliance on the incomplete PSI to describe the petitioner's background and social history, and his failure to investigate, to compile and to present to the trial court any of the substantial mitigating information about the petitioner's troubled background—to sustain that ruling. Accordingly, we must determine if such deficiencies caused the petitioner sufficient prejudice to prevail on his claim of ineffective assistance of counsel at sentencing.

B

We next address the petitioner's argument that the habeas court erred in concluding that, despite its initial assessment that his trial counsel's representation of him at sentencing was so deficient as to be tantamount to having no counsel at all, the petitioner was not entitled to a presumption that he was prejudiced by counsel's performance under *United States* v. *Cronic*, supra, 466 U.S. 648, but, instead, was required to prove that he had been prejudiced by that deficient performance under the second prong of the test set forth in *Strickland* v. *Washington*, supra, 466 U.S. 668. The habeas court reached that conclusion in its memorandum of decision denying the petitioner's postsentencing motion for reconsideration, in which the petitioner first claimed that prejudice should have been presumed in the present case under *Cronic*. The habeas court ultimately ruled that trial counsel's performance in connection

with the petitioner's sentencing, despite its proven deficiencies, was not so poor and incomplete as to raise a presumption of prejudice under *Cronic*, and thus that the proper standard for determining if the petitioner was sufficiently prejudiced by that performance to prevail on his claim of ineffective assistance of counsel at sentencing was the standard set forth in *Strickland*.

The relevant portion of the habeas court's ruling on the motion for reconsideration, with which we fully agree, is as follows: "In *Cronic*, the court held that such a presumption will apply under 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.' The court 'elaborated on the following three scenarios in which prejudice may be presumed: (1) when counsel is denied to a defendant at a critical stage of the proceeding; (2) when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) when counsel is called upon to render assistance in a situation in which no competent attorney could do so.' *Davis* v. *Commissioner of Correction*, 319 Conn. 548, 555, 126 A.3d 538 (2015), cert. denied sub nom. *Semple* v. *Davis*, 578 U.S. 941, 136 S. Ct. 1676, 194 L. Ed. 2d 801 (2016). Importantly, the presumption recognized in *Cronic* 'must be interpreted narrowly and applied rarely.' *Taylor* v. *Commissioner of Correction*, 324 Conn. 631, 649, 153 A.3d 1264 (2017), citing *Vasquez* v. *Commissioner of Correction*, 128 Conn. App. 425, 436–38, 17 A.3d 1089, cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011). In order for *Cronic* to apply, 'counsel's failure to advocate for the defendant during the sentencing proceeding must be complete, rather than at specific points.' . . . *Davis* v. *Commissioner of Correction*, supra, [556], citing *Bell* v. *Cone*, 535 U.S. 685, 697, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). 'Various courts, in explaining the line that divides *Strickland* and *Cronic*, have likewise held that specific errors in representation, for which counsel can provide some reasonable explanation, are properly analyzed under *Strickland*. . . . Counsel's complete failure to advocate for a defendant, however, such that no explanation could possibly justify such conduct, warrants the application of *Cronic*. . . . In the spirit of *Bell*, courts have drawn a distinction between "maladroit performance" and "nonperformance" by applying *Cronic* in cases where counsel's conduct goes beyond "bad, even deplorable assistance" and constitutes "no representation at all . . . ."' (Citations omitted.) *Davis* v. *Commissioner of Correction*, supra, 556." To illustrate this point, the habeas court took special note of our Supreme Court's decision applying *Cronic* in *Davis*, in which counsel not only did nothing to advocate for the petitioner at sentencing, but went further to agree with the prosecutor's recommendation that the court impose the maximum sentence on the petitioner. Id., 561.

In light of these authorities, the habeas court con-

cluded that *Cronic* did not apply in the present case because the petitioner's trial counsel, deficient though his performance was, did more than " 'simply attend' " the sentencing proceeding. Rather, it found, trial counsel had provided the PSI to the petitioner and was familiar with his criminal record. In addition, it noted, trial counsel had "made some remarks, albeit very brief, in support of the petitioner in an attempt to mitigate the petitioner's situation." Accordingly, the court ruled that the present case is distinguishable from *Davis* because, unlike in *Davis*, trial counsel in the present case had done at least something, however minimal, to advance his client's interests at sentencing.

We agree with the habeas court that, under our law, the distinction between cases in which a presumption of prejudice under *Cronic* may appropriately be applied to an ineffective assistance of counsel claim and those in which such a presumption is unwarranted is that in the former, unlike the latter, counsel's challenged representation constitutes or results in the complete denial of representation to the accused, rather than poor, even deplorable, representation. Accord *Cruz* v. *Commissioner of Correction*, supra, 206 Conn. App. 27–34; *Leon* v. *Commissioner of Correction*, supra, 189 Conn. App. 531; *Edwards* v. *Commissioner of Correction*, supra, 183 Conn. App. 843–44.

We also agree with the habeas court that the record before it showed that the petitioner's trial counsel had done at least something to advance the petitioner's interests at sentencing, and thus that counsel's performance did not constitute or result in a complete denial of representation. In addition to the short list of steps the court found that trial counsel had taken to advance the petitioner's interests at sentencing in the present case, the record also shows that trial counsel alluded, in his brief sentencing remarks, to portions of the PSI that mentioned mitigating facts about the petitioner's background, including the petitioner's occasional homelessness and his very minor criminal record. Counsel also made an argument to the sentencing court that the petitioner had a conscience, raising hope for his redemption, based on his sometimes unsolicited cooperation with the police concerning drug dealing and other criminal activity in the neighborhood.

Furthermore, the court could have found that trial counsel had attempted to assist the petitioner in connection with his sentencing by advising him, as the record shows, not to offer a defendant's version of the charged offenses at his PSI interview. Such advice was clearly designed to help the petitioner preserve his claim of innocence in anticipation of his planned appeal, where he intended to seek a new trial at which he could continue to proclaim his innocence. On the basis of those actions, which trial counsel took to assist the petitioner in connection with his sentencing, trial coun-

sel's representation of the petitioner did not constitute or result in a complete denial of representation of the sort required to invoke the *Cronic* presumption. The habeas court therefore did not err in determining that *Strickland*, rather than *Cronic*, applied to the prejudice prong of the petitioner's claim of ineffective assistance of counsel at sentencing.

C

We next turn to the petitioner's argument that the habeas court erred in ruling that, despite trial counsel's deficient performance at sentencing, the habeas court had no power to review or order a remedy for that deficiency, even if it caused the petitioner prejudice, because such an order would result in altering the modified sentence imposed by order of the review division, in putative violation of the finality provision of the Sentence Review Act. The habeas court appears to have based this ruling, which it made initially in its final memorandum of decision then repeated in its postjudgment memorandum of decision denying the petitioner's motion for reconsideration, on language in the Sentence Review Act providing that "[t]he decision of the review division in each case shall be final . . . ." General Statutes § 51-196 (d). On appeal, the petitioner argues that this statutory language does not render any "sentence" imposed by order of the review division immune from legal challenge, but ensures only that all "decisions" of the review division on the limited issues it is statutorily empowered to decide—specifically, whether a challenged sentence is disproportionate, and, if so, how that sentence should be modified to remedy its disproportionality—shall be final and, thus, not reviewable.

The petitioner's reading of the Sentence Review Act is consistent with its plain language, which provides only that the "decision of the review division in each case shall be final . . . ." General Statutes § 51-196 (d). That reading is confirmed, moreover, by controlling Connecticut case law, which holds that, notwithstanding the act's finality provision, illegalities in sentences modified by order of the review division can be reviewed and remedied by way of either a writ of error or a writ of habeas corpus. See *State* v. *Nardini*, 187 Conn. 109, 127–28, 445 A.2d 304 (1982) (if sentence modified by review division "is illegal in any respect the appropriate remedy for correcting such illegality is by appeal to this court . . . by writ of error . . . *or by writ of habeas corpus*" (citations omitted; emphasis added)); see also *Morrison* v. *Commissioner of Correction*, 57 Conn. App. 145, 146–49, 747 A.2d 1058 (clarifying that, whereas appropriate procedural vehicle for challenging legality of any reviewable ruling by review division itself is writ of error, appropriate procedural vehicle for challenging constitutionality of any sentence imposed by review division "on the basis of ineffective assistance of counsel or the denial of the petitioner's

right to counsel" is writ of habeas corpus), cert. denied, 253 Conn. 920, 755 A.2d 215 (2000).

In the present case, in the first count of the operative habeas petition, the petitioner did not challenge any reviewable ruling by the review division itself, much less any unreviewable discretionary decision by it as to either the disproportionality of his original sentence or the extent to which that sentence should be modified to remedy its proven disproportionality. Instead, he claimed that his modified sentence was an unconstitutional product of ineffective assistance of counsel because his trial counsel's deficient performance in connection with his original sentencing had prevented the review division from having access to and considering all of the detailed mitigating information about his troubled background, which his trial counsel had failed to present to the trial court. If the petitioner's trial counsel had properly investigated, developed and presented such information to the trial court, the petitioner argued, then the review division, like the habeas court in this case, would have had such mitigating information before it as part of the trial court record when it reviewed and ordered the modification of his original sentence for disproportionality. Had such information been available to the review division, he claims, there is at least a reasonable probability that the review division would have ordered a more favorable modification of his original sentence than the thirty year reduction it did order, for different reasons, when it acted without the benefit of such mitigating information.

We conclude that the habeas court had the authority to hear and decide such a constitutional challenge to the petitioner's modified sentence under *State* v. *Nardini*, supra, 187 Conn. 127–28, and to order a proper remedy for the violation of his right to the effective assistance of counsel, if such a violation were proved at the habeas trial, in the form of an order that his sentence be vacated and his case returned to the trial court for resentencing. Accordingly, the habeas court erred in ruling that it was barred from reviewing or granting relief as to that claim because of the statutorily mandated finality of the review division's discretionary disproportionality and sentence modification decisions.

D

Having determined that the habeas court properly required the petitioner to prove, under *Strickland*, that he was prejudiced by his trial counsel's deficient performance at sentencing, we next review the petitioner's claim that the habeas court erred in concluding that he failed to meet his burden of proof on that issue with respect to his current total effective sentence, as modified by order of the review division. The habeas court based its ruling on what it described as the petitioner's failure to present "any evidence to show that the . . . review division's decision would have been even more

favorable to him than the thirty year reduction [it previously ordered] . . . ." The petitioner disputes this conclusion, contending that he met his burden of proof on that issue by making two related showings: first, that as a result of trial counsel's deficient performance in connection with his original sentencing, involving counsel's failure to present to the sentencing court significant mitigating information about the petitioner's troubled background and upbringing, such mitigating information was not made part of the trial court record, and thus was unavailable to the review division for the purposes of reviewing his original sentence and determining if and how it should be modified to remedy its alleged disproportionality; and second, that the likely effect of such unpresented mitigating information on the review division's assessment of how much his original sentence should be modified to remedy its disproportionality, as the review division would have assessed it in light of such new information, was so substantial as to undermine confidence that the thirty year sentence reduction it ordered when acting without knowledge of such mitigating information would have been found sufficient to remedy such disproportionality. On that basis, the petitioner claims that he has demonstrated a reasonable probability that his current total effective sentence would have been shorter or more favorable to him than it now is had his trial counsel not rendered deficient performance in connection with his original sentencing. The respondent disagrees, arguing that the petitioner's current sentence, as modified by the review division, is commensurate with the seriousness of the offenses of which he was convicted in light of all relevant sentencing factors.

We conclude that the likely impact of the mitigating information that trial counsel failed to present at the petitioner's original sentencing undermines confidence in his original sentence. It thereby follows that such deficiency undermines confidence in the review division's modification because the review division was confined to the limited mitigating evidence presented at the original trial.

### 1

To begin, there is no question that the direct and immediate cause of the review division's inability to consider the extensive mitigating information concerning the petitioner's troubled background and upbringing was trial counsel's failure to present such information to the trial court at sentencing. This is so because the review division's statutorily prescribed function is limited to reviewing challenged sentences for alleged disproportionality and ordering that they be modified, if and to the extent necessary to remedy their proven disproportionality, solely on the basis of the record before the trial court when such sentences were imposed. This is confirmed by the Sentence Review Act

itself, which establishes and prescribes the powers of the review division, by our rules of practice that govern the manner in which the review division must exercise its statutory authority, and by controlling Connecticut case law interpreting and enforcing these provisions.

Section 51-196 provides in relevant part: "(a) The review division . . . may order such different sentence or sentences to be imposed as could have been imposed at the time of the imposition of the sentence under review . . . . (b) . . . In reviewing any judgment, said division may require the production of presentence or precommitment reports and any other records, documents or exhibits connected with such review proceedings. . . ."

Practice Book § 43-25 provides: "The clerk of the court in which the application is filed shall forward the necessary documents to the review division." Practice Book § 43-26 further provides: "The defendant, at the time the application for review is filed, may request the clerk to forward to the review division any documents in the possession of the clerk previously presented to the judicial authority at the time of the imposition of sentence." Pursuant to Practice Book § 43-27, "[a] hearing upon an application . . . shall be conducted expeditiously upon receipt by the review division of the materials submitted by the clerk . . . . The parties may file such briefs or memoranda as are appropriate to assist the division in the discharge of its duties." Finally, Practice Book § 43-28 provides: "The review division shall review the sentence imposed and determine whether the sentence should be modified because it is inappropriate or disproportionate in the light of the nature of the offense, the character of the offender, the protection of the public interest, and the deterrent, rehabilitative, isolative, and denunciatory purposes for which the sentence was intended." These provisions focus the attention of the review division on documents and materials that were in the trial court record at the time the challenged sentence was imposed and contemplate that the review of a challenged sentence can take place on the basis of such materials as soon as they are transmitted to the review division.

Consistent with that procedure, our Supreme Court has made it clear that, although review of a challenged sentence for alleged disproportionality can properly involve consideration of any sentencing factor, including "the nature of the offense, the character of the offender, the protection of the public interest, and the deterrent, rehabilitative, isolative, and denunciatory purposes for which the sentence was intended"; Practice Book § 43-28; the only evidence bearing on such factors that may appropriately be considered in determining if the sentence as imposed was disproportionate is that which was available to the trial court when it imposed the challenged sentence. Thus, for

example, in *Nelson* v. *Commissioner of Correction*, 326 Conn. 772, 777, 167 A.3d 952 (2017), the petitioner appealed from the review division's dismissal of his application for sentence review and reduction, in which he sought a reduction of his fifty-five year sentence based on his postsentencing cooperation with the state as a witness in a murder case. Our Supreme Court affirmed the review division's judgment, observing as follows: "In reaching its decision, the . . . review division explained that it could not lawfully consider the petitioner's cooperation with the state because that cooperation did not take place until after the petitioner's sentencing, and, therefore, the sentencing court could not have known about it." Id., 778; see *State* v. *Nelson*, Superior Court, judicial district of New Britain, Docket No. CR-05-220383-A (November 2, 2012) (54 Conn. L. Rptr. 904, 905); see also *Nelson* v. *Commissioner of Correction*, 208 Conn. App. 878, 265 A.3d 987 (2021), cert. denied, 341 Conn. 902, 268 A.3d 1186 (2022). This decision confirms that the review division is limited, in reviewing a challenged sentence, to considering only those materials that were before the trial court at the time of the petitioner's initial sentencing.

Because the review division can only consider information and materials that were put before the trial court when the sentence under review was imposed, any alleged failure by trial counsel to present such materials to the sentencing court necessarily affects not only the original sentencing proceeding but any subsequent sentence review proceeding as well. Thus, trial counsel's failure in the present case to present mitigating information to the original sentencing court cannot be remedied before the review division by presenting such information directly to it, and sentence review counsel's failure to proffer such materials to the review division cannot be considered a separate act of ineffective assistance which operates as an independent intervening cause of their unavailability to the review division for the purpose of conducting its review.

2

As for the petitioner's claim that the extensive mitigating information about his troubled background and upbringing, which his trial counsel failed to present to the sentencing court, and thus to make part of the trial court record for purposes of sentence review, was sufficient to undermine confidence in the review division's determination that a thirty year reduction of his original total effective sentence was sufficient to remedy its disproportionality, the petitioner relies initially on his own testimony and that of his expert, DeSauteles, which the habeas court found to be extensive, credible and compelling.

At the habeas trial, the petitioner testified, more specifically, that he had grown up in urban communities beset by high crime and poverty. When he was five or

six years old, he witnessed his mother being attacked by her boyfriend. The New York Office of Children and Family Services (family services office) became involved in the petitioner's life as a result of his mother's neglect. His father used crack cocaine and had no relationship with the petitioner. At the age of seven, the petitioner was subjected to sexual abuse. In November, 1999, the petitioner was admitted to a psychiatric hospital, which, he testified, was a horrible experience. He was subsequently housed for two years at a group foster care home, where he was treated for behavior management and attention deficit hyperactivity disorder.

The petitioner joined a criminal street gang, the Bloods, at the age of eleven. In addition, he also began to use drugs and alcohol around that time. At the age of twelve, the petitioner witnessed his friend being shot in the head by a rival gang member, and, subsequently, the petitioner began to carry a gun. In September, 2004, he was institutionalized at Hollinswood Hospital as a result of further intervention by the family services office. In March, 2005, he was again placed in foster care. The petitioner was briefly placed in a group home, Cardinal McCloskey Community Services, but was discharged after just one week following an incident with another resident. He was then sent to a psychiatric hospital to be treated for physical aggression and sexually provocative behavior.

The petitioner was next discharged to McQuade Diagnostic Center (McQuade), another group home, with diagnoses of oppositional defiant disorder and conduct disorder. The petitioner, on several occasions, ran away from McQuade to be with his family. He remained at McQuade for a few years before moving back to The Children's Village in August, 2007. The Children's Village was unable to care for the petitioner, however, because he continually ran away, and so he was discharged in 2009.

After being discharged from The Children's Village, the petitioner made his way to Hartford in another effort to find and rejoin his family. A few weeks after arriving in Hartford, however, at the age of sixteen, the petitioner was imprisoned at Manson Youth Institution. After his discharge, he was again arrested and imprisoned at Northern Correctional Institution. After his second discharge, the petitioner lived on the streets or stayed with random women. He self-medicated with drugs. Within seven months, the petitioner was back in prison for the crimes at issue in this case. In October, 2012, the petitioner was diagnosed with cancer, for which he underwent surgery, chemotherapy, and radiation.[16]

At the habeas trial, DeSauteles also testified concerning the petitioner's background, and the habeas court credited her testimony, stating: "DeSauteles met with the petitioner five times, obtained background informa-

tion from him during these sessions, and then applied . . . CDC . . . risk factors to all the information she collected. These risk factors . . . are not something within an individual's control and help to explain why they would act a certain way. Risk factors may be grouped by source; thus, there are individual, family, peer social, and community risk factors. [DeSauteles] concluded that multiple risk factors in all the risk factor groups can be used to explain the petitioner's behavior." She also responded in the affirmative to a question on direct examination asking whether "the kinds of issues that [affect] a person's decision making as a juvenile still affect the decision making of an eighteen year old."

DeSauteles testified that she reviewed several records that corroborated the information that the petitioner had related to her during their meetings concerning his background. These materials included records from the Behavioral Health Center at Westchester Medical Center in Valhalla, New York, The Children's Village in Dobbs Ferry, New York, and the New York family services office.

She "concluded that multiple risk factors in all [of] the risk factor groups can be used to explain the petitioner's behavior. . . . [T]he petitioner has a low IQ, early involvement in drugs at age eleven, desensitization to violence through exposure to violence at a young age, and low commitment to academic achievement. . . . [T]he petitioner experienced harsh disciplinary practices, low parental involvement, low emotional attachment to parents and caregivers, low parental education and income, and parental substance abuse and criminality. . . . [T]he petitioner experienced associations with delinquent peers, had a lack of involvement in conventional activities, poor academic performance, low commitment to school, and social rejection by peers. . . . [T]he petitioner grew up with diminished economic opportunities and in a community where there is a large concentration of poor residents." She also testified that, in her experience, mitigation evidence is generally helpful at sentencing and that she, or someone with her credentials, would have been able to provide the petitioner's trial counsel with the same analysis of the risk factors applicable to the petitioner that she had given if such a witness had been contacted by trial counsel before sentencing.

The foregoing information concerning the petitioner's troubled background and upbringing that was presented to the habeas court and found to be so substantially mitigating as to render trial counsel's failure to investigate, to compile and to present it at sentencing a constitutionally deficient performance, is the kind of information that the review division was empowered to consider and rely on in evaluating and remedying, if and to the extent appropriate, the alleged disproportionality of his challenged sentence. It sheds light on

the underlying reasons for his criminal behavior in light of his negative life experiences and may be found to affect the degree to which substantial criminal punishment is necessary or appropriate to protect the public in light of the deterrent, rehabilitative, isolative, and denunciatory purposes for which the sentence was intended.

Consistent with this understanding, the review division in the present case expressly considered certain aspects of the petitioner's background that were documented in the trial court record, including his relative youth and immaturity and his very minor criminal record. The habeas court noted, however, that such information in the trial court record was extremely limited compared to the detailed information about the petitioner's background to which he testified at the habeas trial and DeSauteles had confirmed in her testimony, based on her multiple interviews with the petitioner and her examination of records from the facilities that had housed and treated the petitioner in his youth.

The trial court record is devoid of many notable facts concerning the petitioner's background, which were not included either in the PSI or in trial counsel's very limited sentencing remarks, and thus were not available for consideration by the review division when reviewing the petitioner's challenged sentence. The particular information not available for consideration by the review division included all information pertaining to the petitioner's exposure to violence at a young age, both as a gang member and otherwise; the petitioner's frequent sexual abuse by older children when he was seven years old; details concerning the petitioner's troubled relationship with his drug abusing father; details concerning his relationship with his mother, who frequently could not care for him herself and left him in the control of his teenage sister when she went out of town to work; and details concerning the time the petitioner spent at various institutions that housed and treated him in his youth, including the Behavioral Health Center at Westchester Medical Center in Valhalla, New York, The Children's Village in Dobbs Ferry, New York, and the family services office.

The review division based its finding of disproportionality and its resulting order that his original total effective sentence be reduced by thirty years of imprisonment on the petitioner's argument that that original sentence was longer than the maximum sentence for murder, and thus was far too lengthy for the nonhomicidal offenses of which he had been convicted. The habeas court's determination of deficient performance by trial counsel at sentencing, by contrast, was based on counsel's failure to compile and to present to the trial court substantial, previously unpresented mitigating information about the petitioner's troubled background and upbringing. The habeas court found that

trial counsel's failure to compile and to present such information constituted deficient performance because it deprived the sentencing court of substantial mitigating information that should have been available to it in determining how to sentence the petitioner. Notably, the habeas court also found that "[s]ignificant and extensive evidence was presented at the habeas trial by the petitioner and . . . DeSauteles. This evidence is compelling and should have been available to [the petitioner's trial counsel] to present at sentencing. . . . [Trial counsel] referenced the PSI report and made almost no argument on the petitioner's behalf."

In determining whether there is a reasonable probability that trial counsel's effective assistance at sentencing would have produced a more favorable outcome for the petitioner, the habeas court did not need to find that a different, more favorable modified sentence would, in fact, have been imposed on the petitioner had counsel presented the missing mitigating information to the sentencing court and thereby made that same information available to the review division as part of the trial court record. Instead, the habeas court had to examine the information not presented to the trial court at the petitioner's original sentencing due to trial counsel's deficient performance and determine if its absence from the trial court record, and hence from the record before the sentence review division, undermines confidence in the ultimate outcome of the sentence review process. See *Ruffin* v. *Commissioner of Correction*, supra, 106 Conn. App. 399. In this appeal, we must therefore determine whether the absence of such information concerning the petitioner's background from the trial court record undermines confidence in the review division's determination that the disproportionality of the petitioner's sentence could appropriately be remedied by a thirty year reduction of his total effective sentence rather than a greater reduction of that sentence. We conclude that the potential impact of the previously unpresented mitigating information about the petitioner's troubled background and upbringing on the petitioner's sentence was so substantial, and that the unavailability of such information to the review division when it ordered the thirty year sentence reduction, essentially for different reasons, so undermines confidence in the sufficiency of that reduction to remedy the true nature and extent of the original sentence's disproportionality, as to undermine confidence in the petitioner's sentence, as modified.

In *Sease* v. *Commissioner of Correction*, supra, 212 Conn. App. 99, this court employed a similar approach in determining if a habeas petitioner had been prejudiced by the failure of his trial counsel to present substantial mitigating evidence concerning his mental health history before the trial court that sentenced him in a murder case. The court in *Sease* applied the standard set forth in *Strickland* to a claim of ineffective

assistance of counsel at sentencing in which the petitioner argued that his trial counsel "was ineffective by failing to properly investigate and to adequately present evidence of the petitioner's mental health history in mitigation at the sentencing hearing." Id., 105. In this court's analysis of the prejudice prong of the ineffective assistance of counsel claim, we described our task as follows: "[We] must determine whether, in light of the mitigating evidence that was presented at the habeas trial and not presented at sentencing, there is a reasonable probability that the sentence would have been less severe. . . . The United States Supreme Court has observed that, '[e]ven though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because any amount of [additional] jail time has [s]ixth [a]mendment significance.' " (Citation omitted.) Id., 107–108.

In *Sease*, as in the present case, the sentencing court had before it for its consideration the contents of the petitioner's PSI and the remarks made at sentencing by the petitioner's trial counsel. Id., 108. This court examined the differences between the information contained in the PSI and in the petitioner's mental health records, which were admitted at the petitioner's habeas trial, in order "to determine whether there was a reasonable probability that the additional information contained in the mental health records but not in the [PSI] could have had an effect on the severity of the petitioner's sentence had those records been provided to the sentencing court as mitigating evidence." Id., 111. This court "emphasize[d] that the [PSI] failed to provide the detailed and expanded psychiatric history that was presented in the two mental health records that were admitted as full exhibits at the habeas trial." Id., 113. "The effectiveness of trial counsel at the sentencing hearing is not rendered harmless by the [PSI] . . . . A [PSI] gives a sentencing judge the benefit of a summary background it has gathered on a defendant. It makes a recommendation as to whether incarceration is appropriate; however, the Office of Adult Probation is not an advocate for a criminal defendant before the sentencing court. The role as trial counsel and as an advocate includes relating to the sentencing court how a client's lengthy mental health history could justify some mitigation of the court's sentence unless there are strategic or other good reasons not to do so." Id., 110–11. This court concluded that, "[i]nstead of having illuminating evidence from the mental health records before it, the sentencing court had only the summary [PSI] that recommended a lengthy sentence and trial counsel's statement that he was unaware 'of some of the things that came out of this [PSI]' concerning the petitioner's mental health concerns. Had the sentencing court been aware of the lengthy, detailed psychiatric history in the petitioner's mental health records, there is a reasonable

probability that his sixty year sentence would have been less severe." Id., 114–15.

In the present case, as in *Sease*, the habeas court found credible the substantial mitigating information concerning the petitioner's troubled background that had been presented to it at the habeas trial and determined that it was far more detailed and persuasive than the information presented to the sentencing court in trial counsel's sentencing remarks and the PSI. Specifically, the habeas court stated: "According to the petitioner, he was born with meningitis and was hospitalized for six weeks at birth. Since then, the petitioner's life has been replete with a lengthy litany of hardships. It would serve little purpose to repeat all the details provided by the petitioner about his very troubled life and upbringing. The court accepts his recounting as true. The petitioner's experiences reflect exposure to the individual, family, peer social, and community risk factors identified by . . . DeSauteles, and therefore can be used to try to explain and mitigate his actions resulting in his conviction. [Trial counsel] did not present in any detail any of the petitioner's background at sentencing; instead, counsel simply relied on the PSI report and its contents."[17] The habeas court thus concluded that the petitioner had met his burden under *Strickland* of proving that trial counsel's failure to present such detailed information to the sentencing court constituted a constitutionally deficient performance.

We are persuaded that the extensive information concerning the petitioner's troubled background and upbringing that was presented to the habeas court but not to the trial court at sentencing, and which was not before the review division when it reviewed and ordered the modification of the petitioner's original sentence, is sufficiently mitigating to undermine confidence that the thirty year reduction of that sentence, as ordered by the review division, would have been found sufficient to remedy the disproportionality of that sentence had counsel not failed to present such information in connection with the petitioner's original sentencing. Because the absent information supports different reasons for determining that the petitioner's original sentence was disproportionate than those advanced before the review division, we conclude that there is a reasonable probability that the review division's order modifying his original sentence would have been even more favorable to him than the thirty year reduction it did order if counsel's deficient performance had not deprived it of such mitigating information.

The judgment is reversed as to count one of the fourth amended habeas petition only with respect to the claim that the petitioner's trial counsel provided ineffective assistance at sentencing and the case is remanded to the habeas court with direction to grant the fourth amended habeas petition as to count one in part, to vacate the

petitioner's modified total effective sentence and to remand the case to the trial court for resentencing; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Although § 29-35 (a) was the subject of amendments in 2011 and 2016; see Public Acts 2011, No. 11-213, § 47; Public Acts 2016, No. 16-193, § 9; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Practice Book § 23-30 provides: "(a) The respondent shall file a return to the petition setting forth the facts claimed to justify the detention and attaching any commitment order upon which custody is based.

"(b) The return shall respond to the allegations of the petition and shall allege any facts in support of any claim of procedural default, abuse of the writ, or any other claim that the petitioner is not entitled to relief."

[4] Practice Book § 23-31 provides: "(a) If the return alleges any defense or claim that the petitioner is not entitled to relief, and such allegations are not put in dispute by the petition, the petitioner shall file a reply.

"(b) The reply shall admit or deny any allegations that the petitioner is not entitled to relief.

"(c) The reply shall allege any facts and assert any cause and prejudice claimed to permit review of any issue despite any claimed procedural default. The reply shall not restate the claims of the petition."

[5] The review division may modify sentences only in accordance with the provisions of Practice Book § 43-23 et seq. and General Statutes § 51-194 et seq.

[6] At the hearing before the review division, the petitioner was represented by Attorney John Franckling.

[7] The court also ordered briefing on whether it was barred from considering the constitutionality of the petitioner's modified sentence on the basis of any of the special defenses raised by the respondent and whether the court had to conduct an in camera review of the internal affairs and personnel records when the police department had not asserted any statutory privilege and sought to quash the release of the records.

[8] DeSauteles was disclosed as an expert for the petitioner on March 14, 2019, subsequent to the first day of the habeas trial.

[9] General Statutes § 51-196 (d) provides in relevant part: "The decision of the review division in each case shall be final . . . ."

[10] The motion was styled as a "motion for reconsideration, or in the alternative, to open the judgment, amend the habeas petition and reargue."

[11] "To the extent that factual findings are challenged, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous. . . . [A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Budziszewski* v. *Connecticut Judicial Branch*, 199 Conn. App. 518, 523, 237 A.3d 792, cert. denied, 335 Conn. 965, 240 A.3d 283 (2020).

[12] The petitioner also claims that the state knew of and failed to disclose evidence of Harris' bias in favor of the state. The claim of bias stems from the petitioner's prior assertion that Harris had an undisclosed agreement with the state for a sentence modification in exchange for testimony against the petitioner in the underlying criminal trial. In part I A of this opinion, however, this court rejected that claim, concluding that the record did not support a finding that the state had promised any specific sentence reduction to Harris, but had simply agreed to bring Harris' cooperation to the attention of the judge who would later sentence him on his own pending criminal charges, all of which was fully disclosed through Harris' testimony. The petitioner's claim as to Harris' allegedly undisclosed bias thus necessarily fails, and we need not address it further.

[13] The court informed the petitioner of its ruling as follows: "Sir, I understand you wish for [your trial counsel] to withdraw as your counsel. But for today's purposes, you do not get a new attorney. . . . I've observed [trial counsel] throughout the entire trial. He represented you very adequately; it was a tough case for him to win, and the jury found you guilty. So, there's nothing he did that I observed during the trial that would warrant him being removed from this case."

[14] The PSI was completed on February 27, 2015, without input from the petitioner's trial counsel, and included the following pertinent information. The petitioner did not provide an offender's version at the advice of his trial counsel. The PSI noted that the petitioner did not have a relationship with his father and that, at the age of seven, his mother placed him in foster care because she could not handle him. He spent three years at The Children's Village in Dobbs Ferry, New York, where he was diagnosed with attention deficit hyperactivity disorder and anger issues and was prescribed medications to treat those disorders, which he took between the ages of seven and fifteen. At the age of ten, after spending time back home with his mother, the petitioner spent time in a psychiatric hospital in Valhalla, New York, from which he ran away on numerous occasions in an effort to be reunited with his mother, who had moved to Connecticut. The petitioner's mother stated that the petitioner seemed to look for negative company, and his sister stated that he always hung around the wrong people. The petitioner indicated that, prior to his arrest in the present case, he became homeless and was taken in by a married couple in Hartford, who saw him sleeping in a park and wanted to help him. The couple described the petitioner as being respectful toward them and helpful around their home.

In 2012, while incarcerated, the petitioner was diagnosed with cancer after discovering a lump on his chest. As a result, he underwent six weeks of radiation and chemotherapy. Additionally, the PSI revealed that the petitioner began smoking marijuana at the age of eleven and that he had tried cocaine a few times, used ecstasy pills, and became addicted to heroin. The petitioner's disciplinary history with the Department of Correction includes thirteen disciplinary reports. The PSI also indicated that the petitioner is a member of a gang.

Various records were requested from the New York Office of Children and Family Services, The Children's Village, and the psychiatric hospital in Valhalla, but, as of the time of the writing of the PSI, no records had been received.

Finally, the summary recommendation in the PSI stated: "The offender has a minimal prior record, however, based on the extreme nature of the instant offense a lengthy period of incarceration is warranted . . . ."

[15] "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . . [I]n *Wiggins* v. *Smith*, [539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)] . . . the United States Supreme Court held that although defense counsel was aware of certain aspects of the defendant's background, counsel's failure to compile a complete social history of the defendant was objectively unreasonable and, thus, counsel rendered deficient performance by failing to make a fully informed decision when deciding against presenting such mitigation evidence." (Citation omitted; internal quotation marks omitted.) *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 669, 159 A.3d 1112 (2017).

[16] The petitioner also testified at the habeas trial that, when he was five years old, his mother's boyfriend drank a lot of alcohol, was violent with the petitioner, his sister, and his mother, and beat the petitioner on multiple occasions. In addition, he witnessed his mother's boyfriend choke his mother in the kitchen of their home, and he and his sister grabbed a "bucket of knives" and a "bat" in an effort to help their mother. He testified that, when he was seven, his godsister "used [to] make [him] perform oral sex on her," and that "[i]t happened often." Also, when he was seven, he spent approximately three months in his father's care over the course of a summer. He testified that, during that time, his stepbrother would beat him and "make [him] go in the corner, face the corner, and [make] [him] kneel on rice and stuff like that." He never saw his father again after that summer. During his time spent at a psychiatric hospital in Valhalla, New York, he was often put in five point restraints. Throughout his childhood, his older sister was his primary caretaker, even though she herself was a child, because his mother spent weeks at a time working in New Jersey. The only role model he had in his life other than his sister was his sister's boyfriend, who ultimately introduced him to the Bloods. He testified that, as a result of being made a member of the Bloods at age eleven, he witnessed a lot of violence, including daily fights and frequent shootings. At age eleven, he had sex with a prostitute who was more than twenty years older than him, and, on more than one occasion, he had sexual relations with much older adult women. At age twelve, he did not attend school on a regular basis;

however, he consumed drugs and alcohol regularly. At the age of sixteen, he was stabbed during a gang related altercation.

[17] "[D]ue process does not require that information considered by the trial judge prior to sentencing meet the same high procedural standard as evidence introduced at trial. Rather, judges may consider a wide variety of information. . . . [T]he trial court may consider . . . information relative to the circumstances of the crime and to the convicted person's life and circumstance. . . . It is a fundamental sentencing principle that a sentencing judge may appropriately conduct an inquiry broad in scope, and largely unlimited either as to the kind of information he may consider or the source from which it may come." (Internal quotation marks omitted.) *State* v. *Suzanne P.*, 208 Conn. App. 592, 611, 265 A.3d 951 (2021).

---